# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50274 | **DATE** | 6/6/2002 |
| **CASE TITLE** | | GLOSSON vs. BARNHART | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■   [Other docket entry]   In accordance with the attached, Plaintiff's motion for summary judgment is hereby granted.  Defendant's motion for summary judgment is denied.  This case is hereby remanded to the Commissioner for proceedings in accordance with the above. Enter attached Memorandum Opinion and Order.

(11) ■   [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | JUN 10 2002 | date docketed | 15 |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | ꓤꓤꓴꓳꓳ TƆIЯTꙄIꓷ .Ꙅ.ꓵ ꓘЯƎ⅃Ɔ | 6/6/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| tml | courtroom deputy's initials | ⅠƐ:Ⅰ Mꓒ 6－NꓵꓩᄅO ꓷ⅃Ｉꓞᆿ | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| BESSIE M. GLOSSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 01 C 50274 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, (Plaintiff), seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §§ 416(i), 423 and 1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on October 19, 2001. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.     BACKGROUND

Plaintiff filed for DIB on August 3, 1999, alleging disability beginning on February 10, 1994. (Tr. 91-93). Plaintiff's application for benefits was denied on January 14, 2000. (Tr. 58-61). On March 15, 2000, Plaintiff filed a request for reconsideration. (Tr. 62-63). Plaintiff's request for reconsideration was denied on May 3, 2000. (Tr. 68-70). Plaintiff then filed a request for a hearing

before an Administrative Law Judge (ALJ) on May 22, 2000. (Tr. 71-72). Plaintiff appeared, with counsel, before an ALJ on January 11, 2001. (Tr. 21-55). In a decision dated March 20, 2001, the ALJ found that Plaintiff was not entitled to SSI or DIB. (Tr. 9-20). On March 26, 2001, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 7-8). On July 2, 2001, the Appeals Council denied Plaintiff's request for review. (Tr.4-5).

## II.  FACTS

Plaintiff was born on July 19, 1956, and was 44 years of age at the time of the hearing. Plaintiff testified that she lived in a house with her 21 year old daughter in Rockford, Illinois. (Tr. 27-28). Plaintiff stated that she does have a current driver's license with no restrictions and that she drives several times a week to the store or her mother's house. (Tr. 28). Plaintiff finished high school and one year of college and worked previously as a receptionist, a bank teller and a customer service representative. (Tr. 29). Plaintiff testified that she can no longer do those jobs due to her memory problems and her fatigue. (Tr. 29-30). Plaintiff also stated that she would be unable to work as a cashier or in light assembly due to problems with her left hand, in addition to the memory problems and fatigue. (Tr. 30-31). Plaintiff is currently receiving long-term disability from her last job. (Tr. 31). Plaintiff testified that she is currently being treated by Dr. Dokas, a neurologist and Dr. Asner. (Tr. 31-32). Plaintiff stated that she has some problems with her left foot and that she has an ankle brace but that the brace has not been helping and her left ankle still turns to the side. (Tr. 33). Plaintiff is currently taking Baclofen to relieve the involuntary muscle movements she has been experiencing. (Tr. 34). Plaintiff testified that she had an aneurysm rupture that has resulted in weakness and pain in her left leg that is worse in cold weather. (Tr. 35-36). Plaintiff stated that the

2

rupture also caused a stroke which has caused her to suffer from some memory problems and fatigue. (Tr. 36-37). Plaintiff claimed that she has headaches every day, lasting half an hour to an hour, and that over the counter medication does help. (Tr. 44). Plaintiff stated that she rests throughout the day, she can walk half a block without resting, can stand and sit for 15 to 20 minutes at a time, does not use a cane and has difficulty holding things with her left hand. (Tr. 38-39). Plaintiff testified that she has difficulty concentrating for periods of time. (Tr. 46). As to her daily activities, Plaintiff testified that she usually wakes around 9:00 am, watches television in bed for an hour, washes up, eats breakfast, watches television throughout the day, and eats dinner. (Tr. 39-40). Plaintiff testified that she does some cooking, grocery shopping and light cleaning, such as laundry, occasional dusting and using the light sweeper. (Tr. 40). Plaintiff stated that her daughter helps with the other chores. (Tr. 41). Plaintiff denied doing any yardwork and stated that she previously used a treadmill to walk 15 to 20 minutes, three to five times a week, but no longer did so because she was lazy. (Tr. 41). Plaintiff stated that she attends religious services three to four times a week and that while she used to read in her spare time, she no longer reads because her memory is so poor. (Tr. 42-43). Plaintiff asserted that elevating her legs helped with the involuntary movement and that she elevates her legs throughout the day. (Tr. 48).

On November 10, 1999, Plaintiff's mother, Velma Buchanan, discussed Plaintiff's daily activities during a telephone interview with a nurse, Doloris Gaines, RN, with the Bureau of Disability Determination Services. (Tr. 125). Mrs. Buchanan reported that Plaintiff was never left alone and that the family helps her out quite a bit. (Tr. 125). Mrs. Buchanan stated that Plaintiff is not using a cane but walks very slowly and awkwardly. (Tr. 125). Plaintiff spends most of her day sitting with her feet elevated and is fearful of being in crowds because she may fall. (Tr. 125). Mrs.

Buchanan reported that Plaintiff sometimes forgets to eat, that she does very little for herself beyond preparing cereal and, occasionally, TV dinners and that she is very small in stature (under 100 pounds). (Tr. 125). Mrs. Buchanan stated that Plaintiff needs reminders about her medication and appointments, has memory problems and needs to be redirected to complete tasks. (Tr. 125). Additionally, Plaintiff complains of fatigue daily, has difficulty sleeping and is depressed. (Tr. 126).

Plaintiff's mother also appeared and testified on her behalf before the ALJ. (Tr. 49-51). Mrs. Buchanan testified that she sees Plaintiff nearly every day and lives within a mile of her. (Tr. 49). Mrs. Buchanan stated that she assists Plaintiff in cooking, cleaning and laundry, and occasionally accompanies Plaintiff to the store. (Tr. 50). Mrs. Buchanan testified that Plaintiff has short term, and sometimes long term memory problems and needs to be reminded of appointments. (Tr. 50-51). Mrs. Buchanan stated that Plaintiff's ability to concentrate has worsened in the last two or three years and that her leg has also worsened since her surgery in 1999. (Tr. 51).

The ALJ also called upon a vocational expert, Susan Entenberg. (Tr. 51-55). Ms. Entenberg stated that she had reviewed the materials pertaining to Plaintiff's vocational history and had heard the testimony of Plaintiff and Mrs. Buchanan. (Tr. 52). Ms. Entenberg described Plaintiff's past work as semi-skilled, sedentary and light work. (Tr. 52). The ALJ asked Ms. Entenberg whether an individual, 44 years old, with Plaintiff's educational and vocational history, who can sit, stand or walk for six hours, can frequently carry ten pounds and occasionally carry twenty pounds, who can only occasionally stoop, crawl, climb, crouch, kneel or balance, must avoid exposure to activities involving unprotected heights and hazardous machinery and can only perform simple, unskilled work is able to perform a significant number of jobs existing in the economy. (Tr. 52). Ms. Entenberg responded that an individual with those characteristics could be employed as a packer, light

4

housekeeper or cashier and that approximately 55,000 such jobs exist in the Chicago area. (Tr. 53). The ALJ then asked if any jobs would be eliminated if the individual was unable to use her left foot for repetitive foot controls. (Tr. 53). Ms. Entenberg responded that no jobs would be eliminated by that restriction. (Tr. 53). The ALJ then asked whether any jobs would be eliminated if the individual was unable to grasp with her left hand and Ms. Entenberg again responded that no jobs would be eliminated. (Tr. 53). The ALJ then asked what effect would be had on the number of available jobs if the individual were restricted to limited public contact. (Tr. 53). Ms. Entenberg responded that the cashier job would be eliminated and 25,000 jobs would remain. (Tr. 53). Ms. Entenberg testified that if the individual were to be allowed to sit or stand every 30 to 45 minutes, housekeeping jobs would be eliminated and the available packer jobs would be reduced to 2,000, but that 6,000 inspector and assembly jobs would be available. (Tr. 53). Ms. Entenberg stated that if Plaintiff's statements regarding her restrictions were assumed to be accurate in all respects, including her need to recline throughout the day, no jobs would be available. (Tr. 54). Plaintiff's counsel asked Ms. Entenberg what the minimum period of time for sitting and standing was and Ms. Entenberg stated that the minimum was 30 minutes. (Tr. 54).

## III.   **MEDICAL HISTORY**

On February 10, 1994, Plaintiff was seen at the Rockford Memorial Hospital Emergency Room complaining of acute onset headache with blurry vision, photophobia and nausea. (Tr. 142). A CT scan of the brain revealed subarachnoid hemorrhage, anterior communicating artery aneurysm and a possible distal right internal carotid artery aneurysm, and Plaintiff was referred to a neurosurgeon, Dr. Asner, for evaluation. (Tr. 142-144). On February 11, 1994, Plaintiff underwent

5

a right pterional craniotomy with clipping of the aneurysm. (Tr. 147-148). After the surgery, Plaintiff demonstrated voluntary movement in the right upper and lower extremities but had no noticeable, voluntary movement in her left upper and lower extremities. (Tr. 145). Plaintiff was referred for intensive in-patient rehabilitation. (Tr. 145-146). Plaintiff's discharge summary stated "Her prognosis for further recovery from her infarct remains good. It is hopeful that she will within a few weeks be back to home environment and then eventually be back to work." (Tr. 141).

Following her surgery, Plaintiff was treated at the Rockford Clinic for vocal cord edema and coughing resulting from having been intubated for the surgery. (Tr. 164). Plaintiff was also treated for earache, anemia, heavy menstrual bleeding, eye infection and skin rash in the three years from April 1994 through April 1997. (Tr. 164-178). On July 25, 1997, Plaintiff was seen for a follow-up after a car accident on July 6, 1997. (Tr. 179). The treating physician, Dr. Dale Gray, MD, noted that Plaintiff was suffering from headaches following the accident and had some left leg restlessness that had bothered her since the aneurysm surgery. (Tr. 179). On Aptil 3, 1998, Dr. Gray indicated that Plaintiff was seen to have some disability papers filled out. (Tr. 180). Plaintiff reported that she still had weakness and uncontrolled movements on her left side. (Tr. 180). Dr. Gray indicated that Plaintiff had some very mild residual hemiparesis, as well as some cognitive deficits such as trouble concentrating, memory loss and easy fatiguability. (Tr. 180). On December 3, 1998, Plaintiff had a biannual gynecological exam that revealed cervicitis, vaginitis and the presence of fibroids. (Tr. 182). On December 10, 1998, Plaintiff had a physical exam by Dr. Kenneth O'Neal, MD. (Tr. 183). Dr. O'Neal noted that Plaintiff reported no depression and no sleep or appetite changes. (Tr. 183). Dr. O'Neal indicated that Plaintiff had equal motor strength throughout, bilateral straight leg raise was only 70 degrees on the left due to inherent weakness from the stroke, no ankle clonus and no

pronator drift. (Tr. 183). Dr. O'Neal also noted a circumplexion gait and significant anemia. (Tr. 186). Plaintiff was seen again on December 16, 1998, and it was noted that she suffered from severe anemia, secondary to menorrhagia and leimyoma. (Tr. 187). On March 8, 1999, Plaintiff's physician indicated that she needed a hysterectomy. (Tr. 191). On May 11, 1999, Plaintiff underwent a hysterectomy and following that, she complained of a loss of appetite and pain. (Tr. 193-197). On May 24, 1999, Plaintiff was reportedly doing well, but she was having increased movement of her left arm and leg. (Tr. 196). On June 24, 1999, Plaintiff saw Dr. Asner for her left leg movement and was referred to Dr. Bielkus, a neurologist, regarding a possible extra-pyramidal movement disorder. (Tr. 199). Dr. Asner wrote to Dr. Bielkus that Plaintiff had undergone surgery for aneurysms in February 1994, had suffered a stroke, and had some left leg weakness and cognitive deficits after rehabilitation, preventing her from returning to work. (Tr. 201). Dr. Asner reported that Plaintiff had a hysterectomy on May 11, 1999, and that afterwards she had noted difficulty walking and some aberrant movements of her left leg. (Tr. 201). On August 26, 1999, Dr. Asner indicated that the movements had decreased and were no longer disturbing Plaintiff's sleep. (Tr. 199). In a letter to Dr. O'Neal, Dr. Asner reported that Plaintiff was walking with circumduction and was inverting her foot while walking and that Dr. Bielkus was having a CT scan performed. (Tr. 203). On October 26, 1000, Dr. Asner wrote to Dr. O'Neal that Plaintiff's CT showed no changes and that she was responding to low doses of Baclofen (higher doses caused headaches and mood swings). (Tr. 204). On November 6, 2000, Dr. Asner, in a letter to Dr. Bielkus, indicated that Plaintiff still had some circumduction of her left leg and walked with her left ankle inverted. (Tr. 257). Dr. Asner indicated that he would refer Plaintiff to see if a shoe insert would help and also noted that Plaintiff had been prescribed bi-focal glasses which she declines to wear. (Tr. 257).

In Dr. Bielkus' correspondence with Dr. Asner, she indicated that Plaintiff was exhibiting symptoms of a choreiform movement disorder that is likely related to her stroke. (Tr. 228-229). Dr. Bielkus reported that she did not know of a reason why the condition would worsen following Plaintiff's hysterectomy. (Tr. 229). Dr. Bielkus indicated that Plaintiff exhibited increased tone and weakness in the left lower extremity. (Tr. 228). On December 29, 1999, Dr. Bielkus noted that Plaintiff's condition had improved with medication, but that she was experiencing some blurry vision as a side-effect of the Artane. (Tr. 232). A brain CT scan from August 16, 1999, indicated no significant changes or development of any definite new focal cortical infarction or intercranial hemorrhage. (Tr. 233-234). A November 7, 2000, letter to Dr. Bielkus from Dr. Douglas Schumaker, an opthamologist, reported that internal and external exams of Plaintiff's eyes were unremarkable. (Tr. 253-255).

On December 17, 1999, Plaintiff was seen for a psychological evaluation by John Peggau, Psy.D. (Tr. 208-211). Dr. Peggau noted that Plaintiff reported that she is divorced and has two children, a daughter and a son who are twins, nineteen years old. (Tr. 208). Plaintiff was extremely and overtly fidgety early on in the evaluation. (Tr. 208). Dr. Peggau indicated that he believed Plaintiff was exaggerating the claimed involuntary movements and noted that they later relented. (Tr. 209). Dr. Peggau reported that he was suspicious of the severity of the involuntary movements, particularly given the fact that Plaintiff does drive. (Tr. 209). Plaintiff's appearance was neat and clean, her posture was normal and her gait was normal. (Tr. 209). Dr. Peggau noted that Plaintiff stated it took her a while to get dressed in the morning because she moves so slowly. (Tr. 209). However, Dr. Peggau reported that he did not observe any slow or lethargic movement during the evaluation. (Tr. 209). Dr. Peggau noted that Plaintiff's speech was drawn out and she stammered

early on, but that she was, at times, very fluid and articulate in her speech. (Tr. 209). As for her cognitive abilities, Dr. Peggau noted that Plaintiff was extremely poor in her ability to recall digits and could not complete the serial sevens. (Tr. 210). Dr. Peggau concluded that Plaintiff demonstrated poor math skills and is capable of working successfully with co-workers, supervisors and the public in a somewhat limited capacity. (Tr. 210).

On January 8, 2000, a Psychiatric Review Technique Form (PRTF) was completed with regard to Plaintiff by Pamela Spearman, PhD. (Tr. 212-223). Dr. Spearman found that Plaintiff did not suffer from a psychologically determinable impairment pursuant to the PRTF. (Tr. 212). Dr. Spearman indicated that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods and understand and remember detailed instructions. (Tr. 221). Dr. Spearman concluded that Plaintiff was capable of returning to her previous level of gainful activity and that her memory problems are not sufficiently severe to prevent substantial gainful activity. (Tr. 223). Dr. Spearman found that Plaintiff was able to perform substantial gainful activity that was simple one to two step work with routine supervision. (Tr. 223).

A Residual Functional Capacity (RFC) Assessment was completed as to Plaintiff on September 10, 1999, by Dr. Victoria Dow. (Tr. 235-242). Dr. Dow indicated that Plaintiff had the capacity to lift twenty pounds occasionally and ten pounds frequently, stand or walk for at least two hours and sit for at least six hours in an eight hour work day. (Tr. 236). Dr. Dow found that Plaintiff was limited to climbing, balancing, stooping, kneeling, crouching and crawling only occasionally and that Plaintiff should avoid heights and hazardous machinery. (Tr. 239).

On March 22, 2000, Plaintiff's treating neurologist, Dr. Bielkus, completed a stroke RFC

questionnaire regarding Plaintiff. (Tr. 245-250). Dr. Bielkus indicated that Plaintiff's symptoms are

balance problems, poor coordination, loss of manual dexterity, weakness, unstable walking, sensory

disturbance, pain, fatigue, vertigo, headaches, difficulty remembering, confusion, depression,

emotional lability, personality change, difficulty solving problems, judgment problems, double

vision and tremors. (Tr. 245). Dr. Bielkus reported that Plaintiff is not a malingerer, that she does

have persistent disorganization of motor function and emotional factors contribute to the severity of

her symptoms. (Tr. 246). Dr. Bielkus noted that Plaintiff frequently experiences pain and that she

would be unable to function in a competitive work situation. (Tr. 246). Dr. Bielkus stated that

Plaintiff is able to walk half a block without rest, can sit for half an hour, stand for twenty minutes

and can sit, stand or walk for less than two hours in an eight hour work day with normal breaks. (Tr.

247). Plaintiff would require a job that permitted shifting positions and unscheduled breaks. (Tr.

247). Dr. Bielkus indicated that Plaintiff's legs would feel better if they were elevated during the

day and that she does need a brace if engaged in occasional standing or walking. (Tr. 247-248). Dr.

Bielkus reported that Plaintiff has significant limitations in doing repetitive reaching, handling or

fingering and can use her hands and fingers zero percent of the time and her arms five percent of the

time. (Tr. 248). Dr. Bielkus stated that Plaintiff is unable to stoop or crouch at all. (Tr. 248). Dr.

Bielkus also noted that Plaintiff should avoid all exposure to extreme heat or cold, fumes, odors,

dusts and gases and hazards such as machinery and heights, and that Plaintiff should avoid even

moderate exposure to wetness, humidity and noise. (Tr. 249). Dr. Bielkus stated that Plaintiff is

incapable of performing even a low stress job, that she has mostly bad days and that she would be

unable to work due to absences. (Tr. 249). Finally, Dr. Bielkus noted that Plaintiff has difficulty

hearing and has a slight vision problem. (Tr. 250).

10

On May 31, 2000, Dr. O'Neal completed a disability insurance form for Plaintiff. (Tr. 251-252). Dr. O'Neal indicated that Plaintiff is severely limited in her ability to work due to left-sided weakness. (Tr. 252). Dr. O'Neal reported that Plaintiff can occasionally lift one to ten pounds, but no more than that. (Tr. 252). Dr. O'Neal stated that Plaintiff is able to sit for 30 minutes and walk or stand for 15 minutes. (Tr. 252)

## IV.  **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations.

11

So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D.Ill. 1995).

## V.   FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

12

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R.

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

§ 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional

capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    **ANALYSIS**

The court will proceed through the five step analysis in order.

A.  Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to her decision issued on March 20, 2001. (Tr. 18).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the

15

Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff has a history of cerebrovascular accident and residuals from cerebrovascular disease. (Tr. 18).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.    Step Three: Does claimant's impairment meet or medically equivalent to an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 18).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.    Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. (Tr. 19). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.    Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

16

At Step Five The ALJ determined that although Plaintiff's Residual Functional Capacity did not allow her to perform the full range of light work, there existed a significant number of jobs in the national economy that she can perform.

Specifically, the ALJ determined that Plaintiff is capable of lifting 20 pounds occasionally and 10 pounds frequently, stooping, crouching, climbing etc. occasionally, sitting, standing and walking for 30 to 45 minutes at a time, and that Plaintiff is limited in her ability to work near hazardous machinery or unprotected heights and in her ability to understand, remember or carry out detailed instructions, perform repetitive grasping or handling with her non-dominant left hand and use her left lower extremity for repetitive movements. (Tr. 18). The ALJ found that Plaintiff was therefore capable of performing a limited range of light work, she is 44 years old, has completed the 12th grade, and has no transferable skills. (Tr. 19). With assistance from a vocational expert, the ALJ found that there existed a significant number of jobs in the regional economy that Plaintiff was able to perform given the above factors. (Tr. 19).

Plaintiff objects to the ALJ's findings and asserts that the ALJ erred in 1) failing to give appropriate weight to the treating physicians' opinions and 2) failing to analyze the evidence, in view of Plaintiff's amended alleged onset date. (Plaintiff's Memorandum at 5-6, filed 11/29/2001). This court has reviewed the ALJ's hearing decision and the administrative record and finds that the ALJ's decision is not supported by substantial evidence. The ALJ determined that Plaintiff's allegations of disabling symptoms were not entirely credible based upon the medical evidence provided, Plaintiff's testimony regarding her daily activities and her demeanor during the hearing. (Tr. 16). The ALJ indicated that Plaintiff testified that she was able to do some household chores, prepare her own meals and drive to the store and her mother's house two to three times a week. (Tr. 16).

17

Further, Plaintiff's treatment history failed to support her claims of disabling symptoms. The ALJ noted that Plaintiff had regained much of her strength after her 1994 stroke and did not receive the type of therapy expected of a disabled individual. (Tr. 16). The ALJ found that Plaintiff's use of medication does not support her complaints of disabling symptoms and her complaints of pain and fatigue are not reflected in her treatment records. (Tr. 16). As to Plaintiff's appearance, the ALJ noted that Plaintiff had a generally unpersuasive demeanor during the hearing. (Tr 16). The ALJ noted that Plaintiff would lose her long-term disability benefits if she were to return to work and therefore has an incentive to remain off work and may not be as limited as she claims. (Tr. 16). Finally, with regard to the opinions of Plaintiff's treating physicians, the ALJ indicated that those opinions are not supported by Plaintiff's medical records.

**Plaintiff's treating physicians' reports**

The ALJ raises a valid point in that there is a gap between the records submitted by Plaintiff and the reports of her treating physicians. Plaintiff's medical records indicate that she suffered a stroke in 1994 during surgery on two brain aneurysms. As a result of the stroke, Plaintiff did suffer some paralysis on her left side. After intensive rehabilitation, Plaintiff regained the use of her left extremities; however, she does have some weakness in those limbs and also has a choreiform movement disorder. Dr. O'Neal's opinions, as expressed in a disability insurance form he completed for Plaintiff, are conclusory. This court does note that the ALJ incorrectly stated that Dr. O'Neal was not a treating physician when, in fact, he was. (Tr. 17). Dr. O'Neal indicates that Plaintiff is unable to return to work as a result of her left-sided weakness following a stroke in February of 1994. (Tr. 252). Dr. O'Neal's findings, like Dr. Bielkus', are not fully supported by the medical records contained in the administrative record.

18

Dr. Bielkus' opinions, as stated on the stroke RFC form, indicate limitations not found elsewhere in Plaintiff's medical records. For example, Dr. Bielkus indicates that Plaintiff is severely restricted in her ability to use both her right and left arms, hands and fingers. Dr. Bielkus states that Plaintiff has a hearing problem and must avoid exposure to extreme heat and cold, fumes, noise, and humidity. Dr. Bielkus reported that Plaintiff had significant and persistent disorganization of motor function and listed Plaintiff's circumduction of her left leg when walking as an example. While there is ample evidence in the record to support Dr. Bielkus' findings with respect to Plaintiff's movement disorder and her impaired walking, Dr. Bielkus' other findings do not appear to be supported by the included objective medical evidence.

Dr. Bielkus' correspondence indicates that she saw Plaintiff on multiple occasions and on August 16, 1999, ordered a brain CT on Plaintiff. (Tr. 228-234). The brain CT indicated chronic post-craniotomy changes. (Tr. 233). The CT report noted a right temporoparietal craniotomy with a streak artifact emanating from the right parasellar cistern region, consistent with an aneurysm clip. (Tr. 233). It was further noted that there may be some involvement at the anterior aspect of the temporal lobe and that there is chronic encephalomalacia[3] associated with ex vacuo dilation of the right lateral ventricle and primarily the frontal horn. (Tr. 233). In all honesty, this court does know what the symptoms and impairments of chronic encephalomalacia might be. It may be that the brain CT provides the objective evidence needed to support Dr. Bielkus' opinion. This court is also not convinced that the ALJ knows what chronic encephalomalacia is and the effects it may have on Plaintiff. With respect to the brain CT, the ALJ only noted that no changes were indicated when that

_____

[3] Abnormal softness of the cerebral parenchyma often due to ischemia or infarction. Steadman's Medical Dictionary 587 (27th ed. 2000).

scan was compared to a 1996 scan done on Plaintiff. (Tr. 15).

Also ALJ also noted that Dr. Bielkus' opinion contrasted sharply with other evidence of record, but did not indicate what that other evidence is. Defendant states that the ALJ relied on the opinions of the state agency physicians, Dr. William Conroy and Dr. Patricia Dow. (Defendant's Memorandum at 12, filed 1/14/2002). Dr. Dow completed an RFC assessment as to Plaintiff on September 20, 1999, that was reviewed and affirmed by Dr. Conroy on November 19, 1999. (Tr. 235-242). This court finds that Dr. Dow and Dr. Conroy's assessment is lacking credibility. Typically, the RFC assessments completed by the state agency physicians are conclusory and often the physicians do no more than check off boxes. In this case, Dr. Dow indicated that Plaintiff suffered from a subarachnoid hemorrhage, had left-sided hemiparesis, residual weakness of the left lower extremity, had an unassisted gait, circumduction, and choreiform movements of the lower extremities. (Tr. 236). In spite of this, Dr. Dow found that Plaintiff is capable of standing or walking for six hours in an eight hour work day. (Tr. 236). Dr. Dow also found that Plaintiff is capable of occasionally climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. 237). Dr. Dow failed to complete the subsequent question regarding the evidence used in support of that finding. (Tr. 237). Finally, Dr. Dow indicated that no treating or examining source statement regarding Plaintiff's capacities were in the file for review. (Tr. 241). The ALJ erred in relying on the opinion of a non-treating, non-examining physician rather than on Plaintiff's treating neurologist, Dr. Bielkus.

The ALJ also noted that treating physicians may be biased in favor of finding their patients disabled. *See, Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). While there is a gap between the records submitted by Plaintiff and the opinions of her treating physicians, this court does

20

not accept the ALJ's implication that the treating physicians were swayed by their sympathy for their patient. The fact that not one, but two, physicians have indicated that Plaintiff is totally disabled should militate against the assumption that their opinions are merely the result of their sympathy for their patient and their desire to obtain benefits for her. As for Dr. Peggau's report indicating that Plaintiff may be exaggerating her symptoms, this court notes that Dr. Peggau is not a medical doctor, much less a neurologist, and only saw Plaintiff for a brief visit.

This court is confounded by the fact that the record in this case includes so few medical records for so serious an injury as Plaintiff sustained. The hospital admission records indicate that Plaintiff suffered a Hunt & Hess grade III subarachnoid hemorrhage, requiring immediate surgery and resulting in Plaintiff suffering paralysis to her left side. A post-surgery brain CT scan indicated an increased mass effect in the right frontal, temporal, and parietal region as noted with some midline shift and significant attenuation upon the right lateral ventricle. Also, mixed areas of low density were noted that were believed to be, at least in part, related to postinfarctive changes. (Tr. 156). Plaintiff's hospital records indicate that she required intensive rehabilitation to regain the use of her left side, though those rehabilitation notes are not included in the record. At discharge, it was hoped that Plaintiff would eventually be able to return to work; a more specific prognosis was not given. Later, Plaintiff underwent a hysterectomy which she claims exacerbated her residual left sided weakness, fatigue and movement disorder. The records clearly demonstrate that Plaintiff suffered a severe, life changing, brain injury.

In accordance with the above, this court finds that the ALJ erred in rejecting the opinions of Plaintiff's treating physicians. The Seventh Circuit has stated that the opinion of a treating physician who is familiar with a plaintiff's impairments should be given great weight in disability

21

determinations. *See, Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Further, Social Security regulations provide that more weight be given to the opinion of a specialist. 20 C.F.R. §404.1527(d)(5). While the ALJ may have correctly determined that Dr. Bielkus and Dr. O'Neal's opinions were not entitled to controlling weight, by rejecting those opinions entirely, the ALJ has impermissibly substituted her own medical judgment for that of Plaintiff's treating physicians. *See, Clifford* at 870.

### Plaintiff's credibility

While Plaintiff's treating physicians' reports are not fully supported in the record by objective medical evidence, those reports are substantiated by the testimony of Plaintiff and that of Plaintiff's mother, Mrs. Velma Buchanan. As to Plaintiff's credibility, the ALJ found that Plaintiff's daily activities were not limited to the extent expected of an individual alleging the disabling symptoms alleged by Plaintiff. (Tr. 16). The ALJ stated that Plaintiff testified that she prepares her own meals, drives to the store 2 to 3 times a week and visits her mother 2 to 3 times a week. (Tr. 16). The ALJ also determined that Plaintiff's use of medication and the significant gaps in her treatment history do not suggest the existence of impairments of a greater severity than found in the hearing decision. (Tr. 16). Finally, the ALJ noted that Plaintiff's appearance and demeanor while testifying were generally unpersuasive and specifically indicated that Plaintiff would lose her long-term disability benefits if she returned to work. (Tr. 16).

This court's review of the transcript indicates that Plaintiff testified that she does some light housecleaning, but that the heavier chores are performed by her daughter. (Tr. 41). Plaintiff stated that she prepares some meals and does a little bit of the grocery shopping. (Tr. 40). Plaintiff also stated that she has no hobbies, does not visit with friends, but does see her mother and other family

members regularly. (Tr. 43). Plaintiff's mother testified that she visits Plaintiff nearly every day and assists her with cooking, cleaning and grocery shopping. (Tr. 49-50). In a phone interview with the state Bureau of Disability Determination Services, Mrs. Buchanan stated that Plaintiff must stop and rest while trying to get ready each day. (Tr. 125). Mrs. Buchanan stated that Plaintiff gets out of breath while walking, loses her balance easily and walks slowly and awkwardly. (Tr. 125). Mrs. Buchanan reported that Plaintiff is not left alone much during the day and is able to do very little on her own. (Tr. 125). According to Mrs. Buchanan, Plaintiff complains of fatigue daily, has difficulty sleeping, has difficulty getting up and moving around and is experiencing significant memory and concentration difficulties. (Tr. 126).

The Seventh Circuit has found that a claimant's performance of minimal daily activities does not establish an ability to engage in substantial gainful activity. *Clifford* at 872. In this case, Plaintiff has alleged the type of minimal activities reported in *Clifford* that cannot form the basis for a finding that Plaintiff is capable of engaging in substantial gainful activity. Plaintiff has stated that she does some light cleaning, cooking and grocery shopping. Plaintiff's mother has stated that she and Plaintiff's daughter assist Plaintiff with nearly all her daily activities and that Plaintiff is unable to do much on her own beyond preparing cereal and milk. There is nothing in the record to contradict Plaintiff and Mrs. Buchanan's testimony regarding Plaintiff's limited daily activities. In her hearing decision, the ALJ makes no mention at all of the testimony of Mrs. Buchanan. As has previously been held by the Seventh Circuit and this court, an ALJ's analysis must provide some glimpse into the reasoning behind her decision. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). The ALJ's failure to comment on the testimony of Mrs. Buchanan deprives this court of the ability to review the decision not to consider that evidence.

The ALJ's determination that Plaintiff's lack of medication and gaps in treatment indicate that she may be exaggerating the severity of her impairments is unjustified. There is no evidence in the record to indicate that Plaintiff's treating physicians believed she was not seeking appropriate medical care. It appears that the ALJ is questioning Plaintiff's credibility based upon her assumptions regarding the appropriate course of treatment for a patient following a brain surgery and stroke. Again, this court does not know if Plaintiff's treatment and impairments are consistent with the objective medical evidence of her brain injury. The ALJ is making assumptions based upon the lack of medical evidence in the record. As stated above, the ALJ's determinations as to credibility are to be accorded deference based upon the ALJ's subjective observations of the witnesses. In this case, the ALJ has overlooked substantial evidence in Plaintiff's favor and has exaggerated evidence as to Plaintiff's credibility. For example, the ALJ makes no mention of the corroborating testimony of Plaintiff's mother but does mention that Plaintiff has failed to obtain corrective lenses, no longer exercises on the treadmill because she is lazy, and is receiving long term disability benefits and therefore has a disincentive to return to work. (Tr. 13-16). Therefore this court finds the ALJ erred in her determination as to Plaintiff's credibility based upon the ALJ's failure to consider all the evidence presented.

**RFC determination**

The testimony of Plaintiff and Mrs. Buchanan, in conjunction with the reports of Plaintiff's treating physicians, provide ample evidence in support of Plaintiff's alleged limitations and weigh against the ALJ's RFC determination. This court believes that the ALJ's decision in this case is, in part, based upon the scarcity of medical records rather than substantial evidence. While it is Plaintiff's responsibility to provide evidence regarding her alleged disabling impairments, Plaintiff

24

did provide two reports of treating physicians indicating that she was disabled. The evidence that conflicts with Plaintiff's treating physicians reports is the RFC assessment completed by a non-treating, consulting physician who did not see Plaintiff and the report of Dr. Peggau, a psychologist who saw Plaintiff only briefly. As stated above, the RFC assessment, completed by Dr. Victoria Dow on September 20, 1999, is not fully credible. Dr. Dow indicated that Plaintiff was able to walk or stand for six hours in an eight hour work day, was unlimited in her ability to operate foot and hand controls and had no limitations in her manipulative abilities, in spite of the evidence in the record that Plaintiff was experiencing significant difficulty in walking normally, had a movement disorder in her lower extremities and had residual weakness in her extremities from the 1994 surgery and stroke. Based upon the evidence in the medical record, this RFC assessment is simply nonsense.

As for Dr. Peggau's report, this court has already noted that Dr. Peggau is a psychologist and not as qualified as Plaintiff's treating neurologist to determine the extent of Plaintiff's impairment. Dr. Peggau's report indicates that Plaintiff exaggerates her symptoms noting "The examiner points out the involuntary movement simply because the claimant seemed to exaggerate the movements early on. They later relented, in fact, as the mental status exam continued. The examiner remained suspicious of the impairment degree of the claimant's involuntary movements, particularly given that she does her own driving." (Tr. 209). Dr. Peggau also found Plaintiff's speech patterns to be suspect, noting that they were dramatic, exaggerated and unusual. (Tr. 209). Dr. Peggau concluded that Plaintiff had poor math skills and is probably able to work with co-workers, supervisors and the public in a somewhat limited capacity. Dr. Peggau noted that Plaintiff's diagnosis was deferred from the psychological perspective. (Tr. 210). The reports of Dr. Dow and Dr. Peggau do little to provide evidence in support of the ALJ's RFC determination. Plaintiff sufficiently demonstrated that her

1994 surgery and stroke left her with weakness, a poor memory and fatigue. The ALJ did not adequately provide for those impairments in her RFC determination or refute them in her decision. This court notes that at Step Five, the burden lies with the Commissioner to demonstrate that Plaintiff is capable of performing jobs existing in significant numbers in the national economy. It is questionable whether the ALJ can sustain that burden in this case.

**Onset date**

Plaintiff also asserts that the ALJ erred in failing to consider her amended alleged onset date. However, Plaintiff has not pointed to any specific deficiency in the ALJ's analysis other that the ALJ's finding regarding Plaintiff's daily activities. The ALJ found that Plaintiff's daily activities were not as restricted as would be expected given her claimed limitations. Plaintiff asserts that minimal daily activities cannot equate to an ability to perform work on a sustained basis. It is apparent from the ALJ's hearing decision that the extent of Plaintiff's daily activities were just one of many factors that informed the decision to deny Plaintiff's application for benefits. There is no evidence that Plaintiff's amendment of her amended onset date affected the final decision in this case. Plaintiff did not submit any additional evidence that altered the ALJ's analysis.

This court's review of the medical evidence, the ALJ's hearing decision and the parties' submissions indicates that the ALJ's decision is not supported by substantial evidence, and the ALJ's decision at Step Five of the analysis is therefore reversed.

## VII.   CONCLUSION

In accordance with the above, Plaintiff's motion for summary judgment is hereby granted. Defendant's motion for summary judgment is denied. This case is hereby remanded to the

Commissioner for proceedings in accordance with the above.

**ENTER:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE:** 6/6/02



# United States District Court
## Northern District of Illinois
### Western Division

GLOSSON

v.

MASSANARI

**JUDGMENT IN A CIVIL CASE**

Case Number: 01 C 50274

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■     Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's motion for summary judgment is granted. Defendant's motion is denied. Case is remanded to the Commissioner.

Michael W. Dobbins, Clerk of Court

Gale L. Graeff, Deputy Clerk

Date: 6/6/2002